UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| RALIZA PASHOVA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 1:09-CV-340 JD |
| | ) | |
| DEPUTY SCOTT GEIST, OFFICER | ) | |
| KURT ANDERSON, OFFICER BETH | ) | |
| LEHMAN, OFFICER DAVE REED, | ) | |
| OFFICER BRIAN POTTS, and | ) | |
| WHITLEY COUNTY SHERIFF | ) | |
| MARK HODGES (in his official | ) | |
| capacity), | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

On December 2, 2009, plaintiff Raliza Pashova filed a 42 U.S.C. § 1983 complaint seeking

relief against the defendants for the roles they played in an allegedly unconstitutional use of force.

[DE 1].[1] Pashova sued Whitley County Sheriff's Deputy Scott Geist for using excessive force in

violation of the Fourth Amendment when he tased her in a holding cell following her arrest on

December 8, 2007. [DE 1 ¶ 5]. She sued Whitley County Jail Confinement Officers Kurt Anderson,

Beth Lehman and Dave Reed, as well as Whitley County Reserve Officer Brian Potts for failing to

intervene. [DE 1 ¶ 6].[2] Finally, Pashova sued Whitley County Sheriff Mark Hodges in his official

capacity, alleging that he failed to adequately train his employees and that his unconstitutional or

---

[1] The record is cited in the following format: ["Docket Entry Number" at "page or paragraph number within docket entry"]. No internal page or line numbers will be referenced.

[2] The court refers to Deputy Geist and Officers Anderson, Lehman, Reed and Potts, each of whom was sued in their individual capacity, collectively as the "Officers" throughout this order.

constitutionally defective policies were responsible for the violation that occurred. [DE 1 ¶ 4].[3] The linchpin of the case is Pashova's assertion that Deputy Geist used excessive force against her. If he did not, the other Officers cannot be held liable for failing to intervene, and there is no basis for recovery against the Whitley County Sheriff.

On June 13, 2011, the Officers and the Whitley County Sheriff moved for summary judgment. [DE 43]. They argue that Deputy Geist did not use excessive force against Pashova; that, even if he did, the doctrine of qualified immunity protects the individual-capacity defendants; and that there is no basis for recovery against the Whitley County Sheriff. [DE 44]. The same day, Pashova moved for summary judgment on her claims against the defendants. [DE 47]. Both motions were briefed in full. [DE 55; DE 56; DE 58; DE 59]. In addition to the ordinary response/reply, Pashova filed a motion to strike portions of the defendants' response brief [DE 60] and a motion for leave to file a sur-reply. [DE 61].

Pashova's motion to strike [DE 60] directs the court's attention to a pair of anecdotes in the defendants' response emphasizing the dangers that handcuffed or otherwise restrained arrestees may still pose to an arresting officer. Pashova is correct that these anecdotes are inadmissible because they are hearsay not corroborated by any evidence submitted to the court. "[A] court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 987 (7th Cir. 2009); *see also Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003). The defendants appear to concede as much, because they did not oppose the motion to strike. Accordingly, it is **GRANTED**, and the court will not consider the statements in question.

---

[3] Churubusco Police Officer Chad Fulkerson was dismissed from the case by stipulation on May 17, 2011, and is no longer a party to the litigation. [DE 37; DE 38].

Through a series of filings [DE 61; DE 62; DE 63; DE 65], Pashova also submitted a proposed sur-reply and a notice of additional authority. The defendants responded to these filings [DE 66], but it is not clear whether the defendants opposed the court's consideration of the additional filings already submitted by the plaintiff, or just wanted to go on record as opposing any more that might be filed in the future. In any case, the court read and considered the plaintiff's additional filings, and they have no effect on the court's ruling in this matter. Accordingly, the court **GRANTS** Pashova's requests to file a sur-reply and additional authority [DE 61; DE 65] without any risk of prejudice to the defendants.

Having dealt with those periphery matters, the court turns to resolving the parties' cross-motions for summary judgment. The court finds that the defendants are entitled to summary judgment in full. Even when the facts are viewed in the light most favorable to the plaintiff, Deputy Geist is entitled to qualified immunity because his use of force was objectively reasonable and did not violate the Fourth Amendment. Furthermore, even if it did, it was not clearly established as of December 7, 2008, that his actions deprived Pashova of a constitutional right. Because Deputy Geist's use of force was constitutional, the rest of the complaint fails: the remaining Officers had no duty to intervene if nothing unconstitutional was occurring; and the Whitley County Sheriff's policies, procedures, training and instruction were not constitutionally inadequate if they did not lead to any constitutional violation. In short, the defendants' motion for summary judgment [DE 43] must be **GRANTED** in full. As a result, the plaintiff's motion for summary judgment [DE 47] is **DENIED**. The clerk is **INSTRUCTED** to enter judgment in favor of the defendants.

# FACTUAL BACKGROUND [4]

The facts of this case are almost entirely undisputed, although the parties sometimes characterize them differently. At around 12:30 a.m. on December 8, 2007, Raliza Pashova, twenty-two years old at the time, had just finished her shift as a dancer. Her boyfriend picked her up from her workplace, and Churubusco Police Officer Chad Fulkerson pulled the two over after clocking their vehicle at 83 m.p.h. in a 55 m.p.h. zone. [DE 47-25 at 2]. Pashova was intoxicated, and she was aggressive and uncooperative during the traffic stop. As Officer Fulkerson approached the vehicle, she got out of the passenger seat and walked away barefoot, yelling profane and/or sexual remarks at him. [DE 47-25 at 2]. She attempted to enter an apartment that was not hers, and when Officer Fulkerson grabbed her by the arm to restrain her, Pashova tried to bite his arm and kicked him. [DE 47-25 at 2]. Officer Fulkerson sat Pashova on the ground and told her to settle down, but she continued to scream that she hated the cops and make sexual remarks. [DE 47-25 at 2]. Officer Fulkerson decided to arrest Pashova for public intoxication and resisting arrest. [DE 47-25 at 2].

With some difficulty due to her physical resistance – continued kicking and biting – Officer Fulkerson eventually managed to get Pashova handcuffed and deposited in the back of his cruiser. [DE 47-25 at 2]. But Pashova, still barefoot and cursing loudly, began trying to kick out the back window. With the assistance of backup, including Deputy Scott Geist, Officer Fulkerson put a hobble on Pashova's ankles, secured her in the vehicle, and transported her to the Whitley County Jail. [DE 47-25 at 2]. She was screaming and thrashing about all the while. [DE 47-5 at 2].

---

[4] This section is not meant to be an exhaustive catalogue of every fact or piece of evidence presented to the court. It is simply meant to provide a brief narrative of the events underlying the case. The inclusion of a fact in this section does not mean that it is material, and the exclusion of a fact does not mean that it is immaterial. The court will recount particular events in much greater detail in the "discussion" section of this order.

4

At the Whitley County Jail, Pashova was placed into a padded holding cell, or "rubber room." [DE 47-25 at 2; DE 49]. This did not calm her down. Deputy Geist was joined by Officers Kurt Anderson, Beth Lehman, Dave Reed, and Brian Potts in the holding cell as the group tried to secure Pashova. [DE 47-11 at 4-5]. She continued to struggle, to curse loudly, and to refuse to cooperate or comply with simple requests. [DE 47-1 ¶ 8; DE 47-2 at 3; DE 47-3; DE 47-4; DE 49]. Over a span of about twenty minutes, the Officers worked to move Pashova from the floor of the cell into a Pro-Straint Restraint Chair. [DE 49; DE 47-10].   The chair, a device used for safely restraining prisoners who pose a threat to attending personnel or to themselves, allows law enforcement officers to strap an individual to a solid frame by their ankles, wrists, waist, and upper torso. [DE 47-10]. According to the chair's documentation, there is "nothing for [a restrained prisoner] to hit [her] head on[,]" and it is virtually impossible for the chair to tip over. [DE 47-10 at 4]. It is undisputed that the Officers' decision to move Pashova to the restraint chair was motivated by concerns for her safety. [DE 47-25 at 3].

Securing Pashova in the restraint chair and removing the hobble from her ankles was not an easy task. [DE 49]. She continued to scream, curse, make gratuitous sexual demands and struggle against the Officers and her restraints throughout the process, prompting the Officers to call paramedics for an evaluation of Pashova's condition. [DE 47-25 at 3; DE 49]. Also during this time period, Deputy Geist continually brandished his model X26 or X26E taser, set to drive stun mode, near Pashova's thigh. [DE 47-8; DE 47-25 at 3; DE 49]. In drive stun mode, the taser is used as a pain compliance weapon. [DE 47-7]. The shock is administered by deploying the taser in direct contact with an individual's body or clothing. [DE 47-4; DE 47-7]. This is to be contrasted with the typical "dart mode" taser deployment, where probes are fired at range. [DE 47-7]. Using a taser in

5

drive stun mode, as opposed to dart mode, causes pain to an individual and can leave behind marks and scars, although it does not inflict neuromuscular incapacitation, the familiar whole-body "lock-up" effect of a stun gun. [DE 47-7 at 1–4].

Over the course of the struggle to fasten Pashova into the restraint chair, Deputy Geist deployed the taser in drive stun mode three times. [DE 47-5 at 2; DE 49 at 1:8:51; 1:9:57; 1:16:33]. The first was a warning, which did not make contact with Pashova. [DE 49 at 1:8:51]. The second and third times, Deputy Geist actually tased Pashova on her leg, through her blue jeans. [DE 49 at 1:9:57; 1:16:33]. She had two corresponding marks on her thigh the next day and appears to have suffered no other injuries as a result of the tasings. [DE 47-1 ¶ 6, 9-10]. Towards the end of all this, two paramedics arrived on scene in response to the Officers' call. [DE 47-11 at 5]. After the second tasing, when Pashova was relatively subdued, they were able to attend to her. [DE 49]. They administered some sedatives, drew blood, and she was eventually transported to Parkview Hospital in Fort Wayne for an evaluation. [DE 47-3]. Hospital personnel determined that Pashova did not need to be admitted, and she was released back into the custody of the Whitley County Jail, where she was finally booked and processed. [DE 47-25 at 3; DE 47-15].

Pashova did not remember much the next day. She did not even remember being tased until one of the Officers informed her of the previous night's events. [DE 47-1 ¶ 4; DE 46-4 at 4]. Most of her knowledge of the holding cell episode comes from viewing a Whitley County Jail videotape, which clearly captured all of the events at issue. [DE 47-1 ¶ 5]. The videotape has been provided to the court [DE 49], and it is reviewed in much greater detail during the court's discussion of the legal questions below.

## STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson*, 477 U.S. at 248. A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. On the other hand, where a factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in her favor. *Anderson*, 477 U.S. at 255; *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). But the non-moving party cannot simply rest on the allegations or denials contained in its pleadings. It must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Furthermore, the non-moving party may rely only on admissible evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009).

"There is, however, an added wrinkle in this case: existence in the record of a videotape capturing the events in question." *Scott v. Harris*, 550 U.S. 372, 378 (2007). "There are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened." *Id*. To the extent that the uncontested videotape shows certain facts clearly, there can be no "genuine" dispute as to those facts, and the court need not credit a conflicting version of those facts on summary judgment. *Id*. at 380. The footage simply is what it is. But where the footage is *not* clear on a certain event, or where the parties disagree about a fact external to the videotape or an inference to be drawn therefrom, the usual deference to the non-movant applies.

Finally, the fact that the parties have cross-filed for summary judgment does not change the standard of review. *M.O. v. Indiana Dep't of Educ.*, 635 F.Supp.2d 847, 850 (N.D. Ind. 2009). Cross-motions are typically analyzed separately under the standards applicable to each. *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 n. 4 (7th Cir. 2008). This case is no exception. Because the court has determined that the defendants' motion for summary judgment should be granted in its entirety, it is only necessary to consider that motion.  As a result, the court will construe disputed facts and inferences in the plaintiff's favor throughout this order.

## DISCUSSION

The defendants argued, in support of summary judgment, that Deputy Geist did not use excessive force against Pashova; that, even if he did, the doctrine of qualified immunity protects the individual-capacity defendants; and that there is no basis for recovery against the Whitley County Sheriff. This court finds that Deputy Geist is entitled to qualified immunity because the force he used was objectively reasonable under a Fourth Amendment standard. Moreover, even if Deputy

Geist's conduct *was* unconstitutional, it did not violate any constitutional right that was clearly established as of December 8, 2007. The court's finding that Deputy Geist did not use excessive force means the remaining defendants are also entitled to summary judgment. The other Officers had no constitutional duty to intervene if what Deputy Geist did was not unconstitutional, and there is no basis for holding the Whitley County Sheriff responsible for a failure to train or for defective policies if a constitutional violation never occurred. The defendants' motion for summary judgment must be granted in full.

## I.   DEPUTY GEIST IS ENTITLED TO SUMMARY JUDGMENT ON QUALIFIED IMMUNITY GROUNDS.

When a defendant moves for summary judgment on qualified immunity grounds, we ask whether "viewing the facts in the light most favorable to the plaintiff, the defendants were nonetheless entitled to qualified immunity as a matter of law." *Estate of Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010). "We start with the understanding that governmental actors performing discretionary functions enjoy qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This involves a two-part inquiry. The first question is whether, taking the facts in the light most favorable to the plaintiff, Deputy Geist's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001) (overruled in part by *Pearson v. Callahan*, 555 U.S. 223 (2009)). The second question is whether that particular constitutional right was "clearly established" at the time of the alleged violation. *Id.*[5] In this case,

---

[5] In *Pearson*, the Court broke with its former cases and held that a district court may consider the two prongs of the test in either order. But it often makes sense to address the two questions sequentially. Excessive force claims against government officials often involve new sets of facts and circumstances and are almost always met

the court believes that Deputy Geist's use of the taser on Pashova was constitutionally permissible. But even if it was not, the unconstitutionality of his conduct was not clearly established at the time in question. As a result, Deputy Geist is entitled to summary judgment.

### A.   DEPUTY GEIST'S CONDUCT DID NOT VIOLATE A CONSTITUTIONAL RIGHT.

The first prong of the qualified immunity test asks whether, taking the facts in the light most favorable to the plaintiff, Deputy Geist's use of force violated a constitutional right. In *Graham v. Connor*, 490 U.S. 386, 393 (1989), the Supreme Court rejected the notion that "all excessive force claims brought under § 1983 are governed by a single generic standard." Instead, "[i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Id*. (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). This may be the Fourth Amendment, the Eighth Amendment, or the Fourteenth Amendment, depending on the plaintiff's status within the criminal justice system when the alleged excessive force is applied. *See Graham*, 490 U.S. at 394 (observing that in most instances the constitutional basis for protection from physically abusive government conduct "will be either the Fourth Amendment's prohibition against unreasonable seizures of the person, or the Eighth Amendment's ban on cruel and unusual punishments"). The Fourth Amendment, by its terms, clearly applies to claims of unreasonable force resulting from the initial seizure of an individual, and the Eighth Amendment prohibition on cruel and unusual punishment is the well-established source for the protection of convicted prisoners. Generally speaking, the

---

with a qualified immunity defense. When courts resolve such cases by "skipping ahead" to the clearly established prong, they forego the opportunity to develop constitutional precedent in that area. *Pearson*, 555 U.S. at 236. The court addresses the two prongs sequentially here.

Fourteenth Amendment due process clause fits in between the two, governing claims of excessive force inflicted on pretrial detainees who have not yet been convicted.

The circuits have split, however, on the question of exactly where Fourth Amendment protection ends and Fourteenth Amendment protection begins. *See Wilson v. Spain*, 209 F.3d 713, 715-716 (8th Cir. 2000). As the Eighth Circuit observed in *Wilson*, some circuits hold that an arrestee's Fourth Amendment protections remain active until a *Gerstein*[6] hearing is held or until the arrestee leaves the custody of the arresting officers. *See Aldini v. Johnson*, 609 F.3d 858 (6th Cir. 2010); *Wilson*, 209 F.3d at 715-716; *Barrie v. Grand Cnty.*, 119 F.3d 862, 866 (10th Cir. 1997); *Pierce v. Multnomah Cnty.*, 76 F.3d 1032, 1042–43 (9th Cir.), *cert. denied*, 519 U.S. 1006 (1996); *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989). Others hold that the Fourth Amendment is irrelevant as soon as the act of arrest is complete, and that substantive due process governs the claims of those in Pashova's circumstances. *See Riley v. Dorton*, 115 F.3d 1159, 1161–64 (4th Cir.) (en banc), *cert. denied*, 522 U.S. 1030 (1997) (abrogated on other grounds by *Wilkins v. Gaddy*, 130 S.Ct. 1175 (2010)); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996). The Fifth Circuit has taken a position more like the former than the latter, but without as clear a dividing line. *See Valencia v. Wiggins*, 981 F.2d 1440, 1443–45 (5th Cir.), *cert. denied*, 509 U.S. 905 (1993).

The Seventh Circuit's view has developed over time.  In *Wilkins v. May*, 872 F.2d 190 (7th Cir. 1989), the Seventh Circuit rejected the concept of a "continuing seizure," which had led the Ninth and other circuits to apply Fourth Amendment protections from the time of arrest through arraignment or a *Gerstein* hearing. The court appeared to draw the line at the completion of the initial arrest, and held that the due process clauses of the Fifth and Fourteenth Amendments applied

---

[6] Referencing *Gerstein v. Pugh*, 420 U.S. 103 (1975).

thereafter. *Id*. at 195. But later cases broke the situation down differently. By the time *Lopez v. City of Chi.*, 464 F.3d 711, 718 (7th Cir. 2006), was decided, the Seventh Circuit considered it well-established that "'the protections of the Fourth Amendment apply at arrest and through the *Gerstein* probable cause hearing, due process principles govern a pretrial detainee's conditions of confinement after the judicial determination of probable cause, and the Eighth Amendment applies following conviction.'" *Id*. (quoting *Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992)). The court cited several cases, in addition to *Villanova*, in support of its ruling: *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1018 n. 14 (7th Cir. 2000), noted that after a probable cause hearing the Fourth Amendment no longer applies; *Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999), held that Fourth Amendment applies before the probable cause hearing and Due Process Clause applies after; and *Reed v. City of Chi.*, 77 F.3d 1049, 1052 (7th Cir. 1996), noted that the "seizure" of an arrestee ends after the probable cause hearing. In light of those more recent authorities, the *Lopez* panel made clear that any continued reliance on *Wilkins* would be misplaced.[7] 464 F.3d at 719. In the case *sub judice*, Pashova was arrested and jailed without a warrant, and had not yet been brought before a neutral magistrate for a *Gerstein* hearing when the events in question occurred. Under *Lopez*, the Fourteenth Amendment is inapplicable, and the Fourth Amendment controls.

---

[7] The defendants have called the court's attention to *Forrest v. Prine*, 620 F.3d 739, 743-44 (7th Cir. 2010). That case applied Fourteenth Amendment due process analysis to a post-arrest, pre-*Gerstein* hearing arrestee. Try as the court might, there is no getting around it: *Forrest* stands directly contrary to *Lopez*, and both are "good" law. A district court – bound, as it is, to follow circuit precedent when it has not been overturned – is placed in a difficult position when that precedent internally conflicts. Normally this court would follow the more recent case, but after careful consideration the court is convinced that *Lopez* is the more definitive statement of the rule. In *Forrest*, the court – without citing *Lopez* – declared "we have not yet had occasion to define precisely the contours of [the] temporal limitations" of the Fourth Amendment, and relied on *Wilkins* to hold that, in any event, a pre-*Gerstein* hearing arrestee was outside of those limitations. 620 F.3d at 743. Because the Seventh Circuit *has* had occasion to define the temporal limitations of the Fourth Amendment – in *Villanova*, *Reed*, *Luck*, *Brokaw*, and *Lopez*, inter alia – and because *Forrest* did not address those cases at all, this court must conclude that *Forrest* was not meant to contradict the well-settled standard in our circuit. *Lopez* is the more thorough treatment of the issue, and it is consistent with the standard applied by the majority of the circuit courts of appeal.

### 1.    The Fourth Amendment Test.

"The Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances[.]" *Graham*, 490 U.S. at 399. "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)); *see also Bender*, 600 F.3d at 780; *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009); *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009). This is a fact-sensitive inquiry, and the Seventh Circuit has predictably considered different sets of factors depending on the nature of the case. These might include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [she] actively is resisting arrest or attempting to evade arrest by flight[,]" or "whether the individual was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties." *Bender*, 600 F.3d at 780 (citing *Graham*, 490 U.S. at 397; *McDonald v. Haskins*, 966 F.2d 292, 292-93 (7th Cir. 1992)).

Of course, these "factors" lists are fact-specific – often tailored to cases where excessive force was allegedly used in making the initial arrest – and they should not be read as exhaustive. "The fact-specific nature of whether an officer used excessive force depends on the *totality* of the circumstances surrounding the encounter." *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003) (citing *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 592 (7th Cir. 1997) (emphasis added). "In the end, the excessive force inquiry 'looks to whether the force used to seize the suspect was excessive in relation to the danger [she] posed – to the community or to the arresting officers – if

13

left unattended.'" *Bender*, 600 F.3d at 780 (citing *McDonald*, 966 F.2d at 294; *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993)); *see also Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010) ("Force is reasonable only when exercised in proportion to the threat posed") (citing *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009)); *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (holding that, as the threat changes, so too should the degree of force). Finally, because the inquiry is into the objective reasonableness of the Officers' actions, "subjective concepts like 'malice' and 'sadism'" are irrelevant, *see Graham*, 490 U.S. at 399, and the reasonableness of a use of force is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Sow v. Fortville Police Dep't*, 636 F.3d 293, 303 (7th Cir. 2011) (citing *Graham*, 490 U.S. at 397); *see also Richman v. Sheahan*, 512 F.3d 876, 882 (7th Cir. 2008) ("The officers' intent in using force is irrelevant in a Fourth Amendment case.").[8]

Having laid out the governing legal standard, the court's next task is to apply that standard to the undisputed facts and to the disputed facts and inferences viewed in the light most favorable to the plaintiff. Once the facts are so viewed, "the reasonableness of force [is] a legal issue, rather than an analog of civil negligence." *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003) (citing *Smith v. Ball State Univ.*, 295 F.3d 763, 770–71 (7th Cir. 2002); *Smith v. Chi.*, 242 F.3d 737, 743–44 (7th Cir. 2001); *Hebron v. Touhy*, 18 F.3d 421 (7th Cir. 1994); *Titran v. Ackman*, 893 F.2d 145 (7th Cir. 1990)). As the Seventh Circuit noted in *Bell*, both *Graham* and *Ornelas v. United States*, 517 U.S.

---

[8] The court is aware that some jurisdictions, particularly the Eleventh Circuit and district courts therein, have included a "good faith or malice" factor in their Fourth Amendment consideration. *See, e.g., Borton v. City of Dothan*, 734 F.Supp.2d 1237, 1248 (M.D. Ala. 2010) (citing *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008); *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002)). But the inclusion of this factor in the Eleventh Circuit can be traced back to a *Fourteenth* Amendment case: *Byrd v. Clark*, 783 F.2d 1002, 1006 (11th Cir. 1986) (abrogated on other grounds). An officer's intent underlying a use of force *is* relevant under the Fourteenth Amendment, or under the Eighth, but it is not relative to the objective Fourth Amendment reasonableness inquiry. *Graham*, 490 U.S. at 399.

690 (1996), stress that Fourth Amendment reasonableness should be analyzed objectively, as a matter of law. 321 F.3d at 641. Simply put, "[j]udges rather than juries determine what limits the Constitution places on official conduct." *Id*.[9] Deciding whether the Officers' actions were constitutional requires the court to determine, first, whether and to what extent Pashova's behavior threatened or compromised any legitimate governmental interests, and, second, whether and to what extent the force used in response was reasonable and proportionate to the threat she posed. *See Cyrus*, 624 F.3d at 863; *Santos,* 287 F.3d at 853.

### a.    Governmental Interests.

The undisputed video evidence shows that Deputy Geist tased Pashova twice with an X26 or X26E taser in drive stun mode while she was being strapped into a restraint chair.  Taser deployment record entries 0178, 0179 and 0180 show three deployments during the period in question [DE 47-5 at 2], and each is plainly accounted for in the video. [DE 49 at 1:8:51; 1:9:57; 1:16:33]. The first deployment, at 1:8:51 in the video, lasts one second and is a "warning shot" during which the taser  made no contact with Pashova. From the moment she was brought into the holding cell, Pashova continually struggled against her restraints and yelled slurred and semi-discernible profanities at the Officers. After Officer Lehman, with the aid of the others, managed to change Pashova into a jail shirt, the group began the task of securing her to a restraint chair. Deputy Geist brandished his taser while the others worked to fasten the chair's various straps to

---

[9] This is not to say that district courts should grant summary judgment on excessive force questions even where material facts are in dispute. *See Cyrus*, 624 F.3d at 862 (citing *Bell*, 321 F.3d at 640). In *Cyrus*, the Seventh Circuit held that the district court should not have decided the reasonableness of the defendant's use of a taser as a legal question on summary judgment where testimonial evidence and physical evidence conflicted on the number of taser shocks inflicted. But *Cyrus* does not contradict the basic premise of *Bell* that constitutional reasonableness is a question of law. It merely observes that disputes over the underlying facts that shape the reasonableness analysis remain the province of the jury. But in this context, where the court is tasked with construing the facts a certain way and asking whether, viewing the facts in that way, the conduct in question was constitutional, the court is making a purely legal determination.

Pashova's arms and legs. Eventually, when Pashova's arms, legs and waist were at least partially strapped to the chair, but her upper torso was not, she managed to buck forward suddenly. The Officers stepped back, and Deputy Geist fired the warning charge without contact to Pashova. He then told Pashova "You're about to get tased. Quit it. You're about to get tased. You just need to settle down, or you're gonna get tased. We're done playing games, alright? Settle down, and you can be let free." [DE 49 at 1:8:52-1:9:5]. Deputy Geist then asked Pashova for her name. She did not give it, continuing to shout instead. Deputy Geist reacted, "Ok. Well, we tried to do this the easy way." [DE 49 at 1:9:23]. Another officer commented that they needed to do "the straps," and Deputy Geist returned to holding the taser near Pashova's thigh while the others worked to put the chair's upper-torso straps in place.

Pashova continued to struggle and yell profanities. The second taser deployment, the first to make contact with Pashova, at 1:9:57 in the video, occurred when Deputy Geist tased Pashova in the thigh, through her blue jeans, for a duration of three seconds after she managed to buck forward violently again, precluding the Officers from fastening the upper-torso straps. [DE 47-5 at 2; DE 49 at 1:9:57].  He administered a drive stun mode shock after warning the other officers to "watch out." Pashova became silent after being tased, and Deputy Geist gave her a series of orders: "Now, quit it. Just relax. I don't wanna do that. Now relax." [DE 49 at 1:10:2-1:10:14]. Geist radioed in the tase, and Pashova remained temporarily subdued while the remaining Officers successfully fastened the upper-torso straps in place and tightened the straps around her waist, arms and feet. [DE 49 at 1:10:15-1:11:40]. But Pashova's calmer demeanor did not last long, and soon she was verbally combative again. She continued her loud cursing, but also began to intersperse graphic requests for and/or offers of sexual favors.

One offer, at 1:12:11, resulted in Deputy Geist yelling "If you don't quit it, you're gonna get tased again."   By that point, Pashova was loosely fastened to the restraint chair at all points of contact,  and her mobility was restricted but not eliminated. She had also been fitted with a mask over her mouth to prevent her from spitting on the Officers, although the mask frequently slipped below her mouth, thus failing at its purpose.[10] By 1:13:34 Pashova had been moved to the back of the cell and was secured to the restraint chair to the extent that Officers no longer needed to manually restrain her movements. But she was still wearing a hobble around her ankles underneath the restraint chair's straps, and the Officers wanted to remove it, so they approached again. [DE 49 at 1:13:41]. As the Officers worked to remove the hobble and re-fasten the leg restraints, Pashova remained worked up, and by 1:14:18 she was openly asking Deputy Geist to tase her again. He responded "I don't want to tase you." Shortly thereafter the Officers succeeded in removing the hobble, and when Pashova continued yelling another officer warned her, "You're gonna get tased again." [DE 49 at 1:14:50]. Pashova responded by loudly expressing her desire to be tased, informing the Officers that she liked pain. [DE 49 at 1:15:0-1:15:23].

Around this time, two paramedics arrived on scene to treat Pashova, and were present in the holding cell along with the Officers. One of the Officers expressed his concern to the paramedics that Pashova had "taken something" that caused her to act so tumultuously. [DE 49 at 1:15:40]. Meanwhile, Pashova started persistently offering oral sex to one of the officers working on the restraint chair. She grew increasingly agitated to the point that she was screaming again. One of the Officers told her, "Listen up. Listen up, these are medics," but Pashova continued to scream and

---

[10] While the video was not shot in sufficiently high resolution to conclusively show whether Pashova actually spat on any officer, the fact that she did is undisputed. She later pleaded guilty to a charge of battery by bodily waste as a result of her spitting. [DE 54-1].

push against her restraints.  Meanwhile, although the hobble had been removed from Pashova's ankles, the Officers had not yet completed re-fastening Pashova's leg restraints. Officer Anderson was crouched near her feet attempting to do so when she managed to spit on him while making loud and emphatic sexual demands. [DE 49 at 1:16:12-20]. Officer Anderson walked to the doorway of the cell, wiped his face and told the others, "you better get that mask on - she spit on me." [DE 49 at 1:16:26]. In response, another officer can be seen taking hold of the spit mask by its edges and lifting it up over Pashova's mouth, but as she bucks her head, moving her mouth towards his hands, he quickly pulls his hands away. [DE 49 at 1:16:32].

At this point, Deputy Geist tased Pashova in the thigh a second time. This third drive stun mode taser deployment – the second that actually made contact with Pashova – occurred at 1:16:33 in the video and lasted approximately two seconds. [DE 47-5 at 2; DE 49 at 1:16:33]. As was the case the first time she was tased, Pashova was subdued thereafter. Deputy Geist told Pashova, "Quit it. If you try to bite anybody again, you're gonna get it again." [DE 49 at 1:16:38]. The medical personnel were able to begin attending to Pashova, eventually administering an IV and some sedatives and drawing blood.  Pashova remained verbally combative for some time, but she did grow more physically compliant. By twenty minutes after the final tasing, she was calm enough – although still not totally subdued – that the Officers and medical personnel could leave her unattended in the holding cell for significant periods of time. [DE 49 at 1:36:51-1:48:40]. Eventually, Pashova fell asleep in the restraint chair, and the Officers brought her a pillow. [DE 49 at 2:0:34]. Pashova was not transported to the hospital or booked and processed until some time later, since the Officers were unable to accomplish those things while she was struggling and being uncooperative, but the events beyond the holding cell episode are of limited relevance to the

excessive force inquiry. Throughout the entire holding cell episode, the video depicts the Officers acting in a controlled and methodical, although sometimes frustrated, fashion.

Based on the foregoing undisputed facts, the Officers argue that the use of the taser was a reasonable response to the threat that Pashova posed to the Officers through her spitting and attempted snapping or biting, as well as to the threat that she posed to herself by struggling so determinedly against her restraints. When Deputy Geist tased her, Pashova was a plainly intoxicated, twenty-two year old, 110 lbs. female in varying degrees of restraint as the Officers struggled to fasten the straps of the restraint chair. [DE 47-14 at 2; DE 49]. She was not your typical threat to law enforcement. Nevertheless, based on the undisputed video evidence and Pashova's later plea of guilty to battery by bodily waste [DE 54-1], Pashova did pose *some* threat to any officer within range, as she herself admits. And the Officers would have perceived the threat posed by accidental ingestion of or exposure to her saliva as a significant one, given their concerns that she was a drug user.  Pashova was also indisputably disruptive, uncooperative, and unresponsive.  It is less clear that she was thrashing about so violently as to create a danger to her own safety.  Neither party introduced any medical evidence on the question of whether a person in Pashova's position might cause herself a neck injury by shaking her head, but viewing the video evidence in the light most favorable to the plaintiff shows an individual who is struggling against her restraints in more of a squirmy than a violent manner. In the restraint chair, there was "nothing for [Pashova] to hit [her] head on[,]" and it was virtually impossible for her to tip the chair over. [DE 47-10 at 4]. That said, there was no way for the medical personnel on scene to safely provide needed care to Pashova while she was thrashing about so violently and spitting on whoever came within range. Thus, an

19

objectively reasonable officer may well have had concerns about Pashova's safety, even if they were minor ones.

So, viewing the facts in the light most favorable to Pashova, an objectively reasonable police officer *would* perceive that legitimate governmental interests were threatened, at least to some extent. There was: (1) the problem of Pashova spitting on attending personnel and an apparent attempt to bite; (2) the problem of being completely unable to pacify Pashova so that she could answer basic questions, cooperate with instructions, or be put through the booking process; and (3) a potential issue as to her own safety or need for medical care. The remaining question is whether the force used against Pashova was an objectively reasonable way to protect those governmental interests.

### b.    Force Used.

Deputy Geist tased Pashova with an X26 or X26E taser in drive stun mode. Courts have consistently considered the use of a taser to be an intermediate level of force. *See Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010) (collecting authorities). The Whitley County Sheriff's Department appears to agree. The Department's "Use of Force Continuum" groups "taser and/or defensive aerosol" at an intermediate level of force above verbal persuasion but below more physically violent tactics like the use of a baton or a firearm. [DE 47-24 at 1]. It is also undisputed that Deputy Geist deployed his taser in drive stun mode and for extremely brief periods of time. The evidence indicates that drive stun mode, as opposed to dart mode, does not inflict neuromuscular incapacitation, the familiar whole-body "lock-up" effect of a stun gun. [DE 47-7 at 1]. That distinction is not necessarily dispositive, however, and several courts have held that the use of tasers in drive stun mode *can* still amount to unconstitutionally excessive force when the totality of the

20

circumstances supports that conclusion. *See, e.g., Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (holding that a police officer used excessive force when he used a taser in drive stun mode against a woman who, though still seated in her vehicle, had grown agitated and verbally combative following a traffic stop); *Brown v. City of Golden Valley*, 574 F.3d 491 (8th Cir. 2009) (holding that a police officer used excessive force when he used a taser in drive stun mode against a woman who refused to hang up a phone call after being pulled over for a traffic stop); *but see Lewis v. Downey*, 581 F.3d 467, 477 (7th Cir. 2009) (use of a taser is not *per se* unconstitutional force).  Furthermore, it is undisputed that a taser used in drive stun mode still hurts; that is why the Whitley County Sheriff's Department uses it as a "*pain* compliance" tool. [DE 47-7 at 1 (emphasis added)]. But Deputy Geist's use of the taser differed in another important way from the "average" dart mode taser deployment. The undisputed facts show that Deputy Geist tased Pashova for two and three seconds, respectively, whereas a taser in dart mode deploys for five seconds. [DE 46-1 at 6]. Overall, the undisputed evidence, construed in the light most favorable to Pashova, is that Deputy Geist used his taser, a device that provides for an intermediate level of force, in a slightly less-forceful-than-average, but still painful, way.

c.        **Balancing the Governmental Interests against the Force Used.**

The Seventh Circuit has not decided the constitutional question in many Fourth Amendment excessive force cases hinging on the use of a taser. In *United States v. Norris*, 640 F.3d 295 (7th Cir. 2011), the court held that it is not objectively unreasonable for an officer who is searching a residence to use a taser to subdue an unrestrained individual who poses a potential threat and who is refusing to comply with police commands. But that case does not control here; the facts are too different.  In *Cyrus*, 624 F.3d 856, the Seventh Circuit held that summary judgment was

21

inappropriate on the question of whether an arresting officer used excessive force, because there was a question of fact as to whether he tased the arrestee six or twelve times. That is no help here, either. The facts surrounding Deputy Geist's use of the taser are captured on a videotape, the accuracy of which is undisputed. There are no substantial factual disputes like the one at issue in *Cyrus*. *See also Stanley v. City of Portage*, 2011 WL 830643 (N.D. Ind. March 3, 2011) (summary judgment denied on excessive force claim where court could not tell, due to factual disputes, what the "facts and circumstances" were).  The court must rely on broader principles.

The factors recited by the Seventh Circuit in *Bender*, although not perfectly representative of the facts of this case, are helpful. *See Bender*, 600 F.3d at 780 (citing *Graham*, 490 U.S. at 397; *McDonald*, 966 F.2d at 292-93). These include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [she] actively is resisting arrest or attempting to evade arrest by flight[,]" or "whether the individual was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties." *Id.*  Although the crimes for which Pashova was initially arrested, public intoxication and resisting arrest, were no longer an issue, the crime which she was committing during the holding room episode, and which the Officers were trying to prevent, was battery by bodily waste. Under Indiana state law, that is a felony.[11] Partially restrained or not, someone who is attempting to commit a felony battery against law enforcement officials, and experiencing some success, could certainly be said to pose an immediate threat to the safety of the officers.

---

[11] *See* I.C. § 35-42-2-6(e), "A person who knowingly or intentionally in a rude, insolent, or angry manner places blood or another body fluid or waste on a law enforcement officer . . . commits battery by body waste, a Class D felony." The offense may attain a higher felony status if the individual committing it is aware that they suffer from Hepatitis or another transferable disease.

Additionally, while Pashova was not resisting arrest or attempting to evade arrest by flight, she *was* indisputably interfering with the Officers' execution of their duties. The duties of a police officer do not begin and end with the arrest. *Inter alia*, an officer must process and book the arrestee, verify that the arrestee poses no threat to others, and take steps to ensure that the arrestee does not pose any threat to herself.  Pashova was preventing the Officers from accomplishing those goals. In a prison context – admittedly governed by the Eighth Amendment – disruption and prolonged hysteria are valid justifications for the use of a taser. *See Lewis*, 581 F.3d at 477 (citing *Hickey v. Reeder*, 12 F.3d 754, 759 (8th Cir. 1993) (collecting cases)); *Caldwell v. Moore*, 968 F.2d 595 (6th Cir. 1992). Of course, an action might still be objectively unreasonable without being cruel and unusual. But these cases are helpful inasmuch as they provide examples of the kind of behavior, in a jailhouse setting, that might warrant taser deployment. Pashova's seems applicable.

In light of the foregoing factors, the court finds that Deputy Geist's use of a lower-intermediate level of force, in the form of two short-duration taser deployments in drive stun mode after repeated clear warnings, was within the range of reasonable pain compliance tactics under the circumstances. This does not mean that it was prudent, or desirable, or that the court condones or sanctions the practice. It just means it was not an unconstitutionally excessive use of force under the Fourth Amendment. For that reason alone, summary judgment must be granted in Deputy Geist's favor on qualified immunity grounds. But even if the answer to this question were different, the court would still grant summary judgment to Deputy Geist because Pashova did not carry her burden of showing that his conduct violated a "clearly established" constitutional right.

### B.   PASHOVA HAS NOT CARRIED HER BURDEN OF SHOWING THAT DEPUTY GEIST'S USE OF THE TASER VIOLATED A CLEARLY ESTABLISHED CONSTITUTIONAL RIGHT.

As part of their qualified immunity argument, the Officers claim they are entitled to qualified immunity because Deputy Geist did not violate a right that was clearly established as of December 8, 2007, when the force application occurred. Pashova bears the burden of establishing that the constitutional right at issue was clearly established. *See Bender*, 600 F.3d at 779 (citing *Kroger v. Bryan*, 523 F.3d 789, 802 (7th Cir. 2008) (a plaintiff seeking to defeat an assertion of qualified immunity must establish "that the law concerning the plaintiff's asserted right was clearly established at the time the challenged conduct occurred.") (internal quotations omitted); *Boyd v. Owen*, 481 F.3d 520, 526 (7th Cir. 2007)). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right'; however, an official action is not protected by qualified immunity only when the very action in question has previously been held unlawful, rather the unlawfulness must be apparent 'in light of the pre-existing law.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "A violation may be clearly established if the violation is so obvious that a reasonable state actor would know that what they are doing violates the Constitution, *or* if a closely analogous case establishes that the conduct is unconstitutional." *Siebert v. Severino*, 256 F.3d 648, 654-55 (7th Cir. 2001) (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1022 (7th Cir. 2000)) (emphasis added).

"The difficult part of this inquiry is identifying the level of generality at which the constitutional right must be clearly established." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007) (McConnell, J.). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an

24

unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al- Kidd*, 131 S.Ct. 2074, 2084 (2011) (internal citations omitted). "In other words, the fact that it is clear that any unreasonable use of force is unconstitutional does not mean that it is always clear *which* uses of force are unreasonable." *Casey*, 509 F.3d at 1284 (emphasis in original). The Seventh Circuit has long held that "the test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted." *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987); *see also Baird v. Bd. of Educ. For Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 696 (7th Cir. 2004) ("Our inquiry is defined by whether 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'") (quoting *Saucier*, 533 U.S. at 202). Bearing these standards in mind, the court turns to assessing Pashova's efforts to prove that a right was clearly established at the time in question.

### 1.  Pashova has not introduced closely analogous cases establishing that the conduct was unconstitutional.

"When looking at closely analogous cases to determine if a right was clearly established at the time of the violation, we look first to controlling precedent on the issue from the Supreme Court and to precedent from this Circuit." *Bender*, 600 F.3d at 781. There is no controlling precedent available; the Seventh Circuit and Supreme Court have yet to discuss the Fourth Amendment propriety of the use of tasers against detained arrestees in a factual context sufficiently close to Pashova's to control the outcome here. "In the absence of controlling precedent, we must broaden our survey to include all relevant case law in order to determine 'whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time.'" *Id.* (quoting *Jacobs v. City of Chi.*, 215 F.3d

25

758, 766 (7th Cir. 2000)). For example, a case that forbids using a clearly equivalent level of force against an arrestee providing a clearly equivalent challenge to governmental interests might suffice.

But it is Pashova's burden to bring closely analogous case law to the court's attention, and she has failed to do so. She cites just one case from our circuit: *Freeman v. Franzen*, 695 F.2d 485 (7th Cir. 1982). That case is not particularly instructive. It is true that the plaintiff/appellee in *Freeman* was awarded a small judgment in the district court after alleging that he was, essentially, gang-beaten in his cell by prison guards. But the excessive force issue was not before the court of appeals, and it was governed by a different constitutional standard than the Officers' conduct in this case as a result of the plaintiff's prisoner status. And, it involved dissimilar police action. In short, *Freeman* is too dissimilar in both fact and law to "clearly establish" much of anything for Pashova's purposes.

Pashova also invokes a pair of district court cases from within our circuit. *See Granger v. Webb*, 2009 WL 1766826 (N.D. Ind. June 23, 2009) (holding that it is objectively unreasonable for eight police officers to levy an extended physical assault – kicking, kneeing and punching – on a restrained arrestee); *Thomson v. Jones*, 619 F.Supp. 745, 755 (N.D. Ill. 1985). *Granger* is distinguishable for a variety of reasons, but perhaps most importantly because it was decided in 2009. It cannot prove that the law was clearly established as of December 8, 2007, when Deputy Geist tased Pashova. *Thomson*, decided in 1985, held that a restrained prisoner's Eighth and Fourteenth Amendment rights were violated when prison guards dragged him up and down concrete stairways by the handcuffs, punched, kicked and choked him, and banged his head against a metal food cart repeatedly. *Thomson* does stand for the obvious proposition that extended, brutal, and almost entirely unprovoked law enforcement beat-downs are generally unconstitutional, but it does

26

not clearly establish that the calculated, pre-warned infliction of a two- and three-second drive stun mode taser shock on a partially restrained arrestee is likewise unconstitutional.

Pashova next cites two external appellate cases – *Porro v. Barnes*, 624 F.3d 1322 (10th Cir. 2010), and *Orem v. Rephann*, 523 F.3d 442 (4th Cir. 2008) – for the proposition that Deputy Geist's use of the taser violated a clearly established right. *Porro* does not seem helpful to Pashova's case at all. The Tenth Circuit, working under a Fourteenth Amendment standard, held that "[t]he use of tasers in at least some circumstances – such as in a good faith effort to stop a detainee who is attempting to inflict harm on others – *can* comport with due process." 624 F.3d at 1329 (emphasis added) (citing *Hunter v. Young*, 238 Fed. Appx. 336, 339 (10th Cir. 2007) (use of taser is not per se unconstitutional when used to compel obedience by inmates)). And *Orem v. Rephann* is not much more useful. In that case, the defendant police officer tased the plaintiff arrestee while the plaintiff was handcuffed and in foot restraints. The Fourth Circuit analyzes uncharged arrestee excessive force claims under the Fourteenth, rather than the Fourth, Amendment, and the court denied summary judgment against the plaintiff because a reasonable jury might find that the use of the taser "inflicted unnecessary and wanton pain and suffering." 523 F.3d at 446-47. A holding that a reasonable jury *might* find the use of a taser against a restrained individual impermissible under the Due Process Clause when the facts are viewed a certain way is not the same as a holding that the use of a taser against a restrained individual *is* unreasonable under the Fourth Amendment as a matter of constitutional law, and the former proposition does not clearly establish the latter. Moreover, *Porro* and *Orem*, like *Granger*, were decided after the incident underlying this case occurred, and they come from non-binding jurisdictions.

Finally, Pashova points the court to a series of unpublished cases from the District of Minnesota holding that the use of a taser is unconstitutionally excessive when it is "deployed on uncooperative but non-dangerous plaintiffs." *See Willenbring v. City of Breezy Point*, 2010 WL 3724361 at *6 (D. Minn. Sept. 16, 2010) (collecting cases). But the facts of those cases were far more egregious than the facts of this one. In *Willenbring*, for example, a police officer sought to arrest a woman for public intoxication outside a bar. When she resisted, he tackled her. When she broke free, he pepper-sprayed her in the face, tore her pants off, and dart-mode tased her seven times, causing her to soil herself. The district court was right to call that unreasonable, but it is not that similar to what happened here. Even an objectively reasonable police officer who *was* aware of those cases could hardly be expected to recognize, if he acted as the Officers did in this case, that his own conduct fell within the purview of what they forbid. In short, the *Willenbring* cases do not clearly establish a right to the extent that Deputy Geist is not entitled to qualified immunity, and neither do any of the others Pashova has introduced.

### 2.     The violation – even if one existed – was not so obvious that a reasonable state actor would know that what he was doing violated the Constitution.

For reasons already discussed at length, this court has found that Deputy Geist acted within the bounds of the Fourth Amendment when he tased Pashova. Even if reasonable jurists could differ over whether or not Deputy Geist's conduct amounted to a violation of the Fourth Amendment at all, it would be difficult to say that the violation "is so obvious that a reasonable state actor would know that what they are doing violates the Constitution." *Siebert*, 256 F.3d at 654-55.   An objectively reasonable state actor, observing the undisputed events at the center of this case, simply would not have known that the use of two short-duration deployments of a taser in drive stun mode to bring Pashova into compliance was unconstitutional. In short, even when the facts are viewed in

the light most favorable to her, Pashova has not shown that Deputy Geist violated a clearly established constitutional right. As a result, Deputy Geist is entitled to qualified immunity, and summary judgment must be granted on his behalf.

## II.    THE REMAINING OFFICERS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE DEPUTY GEIST'S USE OF FORCE WAS NOT UNCONSTITUTIONAL.

Pashova sued the Officers other than Geist – Lehman, Anderson, Fulkerson and Reed – for their failure to intervene. [DE 1 ¶ 6]. Pashova is correct that "an officer has a duty under § 1983 'to intervene to prevent a false arrest or the use of excessive force if the officer is informed of the facts that establish a constitutional violation and has the ability to prevent it.'" *Stanley*, 2011 WL 830643 at *5 (quoting *Morfin v. City of East Chi.*, 349 F.3d 989, 1001 (7th Cir. 1994)); *see also Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1992). But the court has already explained that Deputy Geist's use of force against Pashova was not unconstitutional. The remaining Officers thus had no duty to intervene, and summary judgment must be granted on their behalf as a matter of law.

## III.    THE WHITLEY COUNTY SHERIFF IS ENTITLED TO SUMMARY JUDGMENT BECAUSE NO CONSTITUTIONAL VIOLATION OCCURRED.

Pashova's failure to train and defective policy claims against Sheriff Hodges in his official capacity amount to a suit against the municipal entity he represents: the office of the Whitley County Sheriff. *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55 (1970); *Smith v. Stoner*, 594 F.Supp. 1091, 1112 (N.D. Ind. 1984). A municipality is liable under § 1983 for its customs and policies, or for a failure to adequately train its employees, which result in a deprivation of federal rights. *Monell*, 436 U.S. at 694. A governmental entity may be liable under § 1983 only if the entity caused the constitutional deprivation through a policy statement, ordinance, regulation or decision officially adopted and

29

promulgated by the entity's officers. *Monell*, 436 U.S. at 690. As previously discussed at length, there was no constitutional deprivation in this case. There is nothing for the Whitley County Sheriff to be liable for, and summary judgment must be granted in the sheriff's favor. *See, e.g., Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 501 (7th Cir. 2010) (holding that "[b]ecause the officers did not violate [plaintiff]'s Fourth Amendment rights by the way in which they used the hobble, the City itself cannot be liable under *Monell* for failure to properly train them in the use of the device.").

## CONCLUSION

The court **GRANTS** Pashova's motion to strike [DE 60] and her motion for leave to file sur-reply and notice of supplemental authority [DE 61; DE 65]. But, considering the totality of the circumstances, even viewed in the light most favorable to the plaintiff, Deputy Geist did not use excessive force when he deployed two short-duration drive stun mode taser shots against Pashova. Accordingly, the individual-capacity defendants are entitled to qualified immunity, and all of the defendants are entitled to summary judgment in full. The court **GRANTS** the defendants' motion for summary judgment [DE 43], **DENIES** the plaintiff's motion for summary judgment [DE 47], and **INSTRUCTS** the clerk to enter judgment for the defendants in this case.

SO ORDERED.

ENTERED:   March 29, 2012

＿＿＿＿＿＿   /s/ JON E. DEGUILIO   ＿＿＿＿＿
Judge
United States District Court

30